**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ORTIZ GLAZE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 3120 |
| | ) | |
| v. | ) | Judge Amy St. Eve |
| | ) | |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

The Court, in its discretion, denies Defendant City of Chicago's motion to bifurcate and stay discovery and trial [43]. Status hearing set for 10/28/14 is stricken and reset to 10/7/14 at 8:30 a.m.

**STATEMENT**

On May 22, 2014, Plaintiff Ortiz Glaze brought the present sixteen-count First Amended Complaint against Defendants City of Chicago and certain Chicago police officers alleging constitutional violations and state law claims, including a claim against the City under *Monell v. Dep't of Soc. Servs. of the City of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Before the Court is the City's motion to bifurcate Glaze's *Monell* claim from his other constitutional claims for discovery purposes and trial. *See* Fed. R. Civ. P. 42(b). For the following reasons, the Court, in its discretion, denies the City's motion.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 26 provides federal district courts with broad discretion to tailor the sequence of discovery, especially when a plaintiff files a complaint against public officials. *See Crawford-El v. Britton,* 523 U.S. 574, 597-98, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *see also Bond v. Uteras,* 585 F.3d 1061, 1075 (7th Cir. 2009). Under Rule 42(b), the Court may bifurcate issues for trial or discovery if the separation prevents prejudice to a party or promotes judicial economy. *See Chlopek v. Federal Ins. Co.,* 499 F.3d 692, 700 (7th Cir. 2007). Whether to bifurcate discovery or trial is a decision committed to the district court's sound discretion and is made on a case-by-case basis. *See Volkman v. Ryker*, 736 F.3d. 1084,1088-89 (7th Cir. 2013); *Krocka v. City of Chicago,* 203 F.3d 507, 516 (7th Cir. 2000). Bifurcation is the exception, not the rule, and the City bears the burden of demonstrating that concerns of judicial economy or prejudice weigh in favor of the Court bifurcating *Monell* discovery and trial. *See Trading Tech. Int'l, Inc. v. eSpeed, Inc.*, 507 F.Supp.2d 870, 871 (N.D. Ill. 2007); *Real v. Bunn–O–Matic Corp.,* 195 F.R.D. 618, 620 (N.D. Ill. 2000).

## BACKGROUND

### I.    Allegations Against Defendant Officers

In his First Amended Complaint, Glaze alleges that he spent the morning and early afternoon of April 30, 2013 preparing for a gathering and cook-out that took place on the 88th block of South Burley Avenue in Chicago.  (R. 10, First Am. Compl. ¶ 10.)  The cook-out, commemorating a deceased friend, included entertaining over fifty friends, family members, and neighbors of the deceased of all ages.  (*Id*. ¶¶ 10, 11).  At around 9:00 p.m., a group of Defendant Officers arrived in three police cars traveling north on South Burley Avenue.  (*Id*. ¶ 14.)  After exiting an unmarked police car, Defendant Jones fired his gun — possibly as a warning shot.  (*Id*. ¶ 17.)  Startled by the gunshot and the arrival of numerous police officers, the crowd began to disperse and/or run away, including Glaze.  (*Id*. ¶¶ 17, 24.)

Defendant Jones chased Glaze on foot and fired shots at him.  (*Id*. ¶ 18.)  Also, Defendant Garcia chased Glaze in the unmarked police car, caught up with him just a few moments later, and exited his squad car.  (*Id*. ¶ 19.)  Defendant Garcia then fired multiple shots at Glaze.  (*Id*.)  In total, Defendant Officers fired at least ten bullets at Glaze, two of which struck Glaze in the back of his upper left arm and the back of his left thigh causing him to fall to the ground.  (*Id*. ¶ 20.)  According to Glaze, at the time Defendant Officers shot him, he was unarmed, did not reach for his waistband, was not pointing anything, and did not pose a threat to the officers.  (*Id.* ¶ 21.)

Defendants Jones and Garcia were the first two people to reach Glaze after the shooting.  (*Id*. ¶ 22.)  Because Glaze's left arm had been immobilized by the gunshot wound, Defendants Jones and Garcia handcuffed Glaze's right hand to his belt loop.  (*Id*.)  Defendant Garcia searched Glaze and did not recover a weapon.  (*Id*. ¶¶ 22, 23.)  Defendant Officers then arrested Glaze and sent him via ambulance to the hospital for treatment of his gunshot wounds.  (*Id*. ¶¶ 24, 25.)  Glaze remained in custody while at the hospital where Defendant Officers kept him restrained.  (*Id*. ¶¶ 25, 26.)  Defendant Officers also confiscated and inventoried Glaze's belongings, including an iPhone, state identification card, keys, and money.  (*Id*. ¶ 27.)  When Defendant Officers returned his belongings, a sum of money was missing.  (*Id*. ¶ 28.)

Glaze further alleges that Defendant Officers knew that he did not commit a crime and that there was no probable cause to support any criminal charge against him, but nonetheless pursued criminal charges against him to cover up the unjustified shooting.  (*Id*. ¶ 30.)  To that end, Defendant Officers attempted to persuade the Felony Review Unit of the Cook County State's Attorney's Office to seek felony charges against Glaze, falsely claiming that Glaze had threatened Defendants Jones and Garcia.  (*Id*. ¶ 31.)  The Felony Review Unit reviewed Glaze's case the day after the shooting and declined to file felony charges.  (*Id*.)  Nevertheless, Defendant Officers falsely charged Glaze with four misdemeanor offenses — aggravated assault of Defendants Jones and Garcia and resisting and obstructing Defendants Jones and Garcia.  (*Id*. ¶ 32.)  In support of the charges, various individual defendants claimed that each series of shots that the officers fired at Glaze had been preceded by Glaze reaching into his waistband and

making threatening movements with his right arm.  (*Id*. ¶ 33.)  Various Defendant Officers, including Jones and Garcia, stated that Glaze held a firearm in his right hand describing the gun as a semi-automatic firearm.  (*Id*. ¶ 34.)  Glaze alleges that these statements were fabricated and that Defendant Officers did not recover a gun from him during their search of him.  (*Id*. ¶¶ 35, 36.)

Furthermore, Glaze maintains that realizing they needed a plausible explanation for shooting him in the back, various Defendant Officers conspired to plant a second cell phone on him and then falsely claimed that they had recovered the silver Samsung phone from him at the hospital.  (*Id*. ¶ 39.)  Defendant Officers did not inventory the Samsung phone at the same time as the other items recovered from Glaze.  (*Id*.)  Instead, Defendant Connolly falsely claimed that the Samsung phone had appeared without explanation on top of a pile of Glaze's clothing in his hospital room.  (*Id*.)  Thereafter, Defendant Connolly claimed that the silver Samsung phone could have been the object that Glaze supposedly brandished at Defendants Jones and Garcia, prompting them to shoot him.  (*Id*.)  At his trial on March 5, 2014, Defendant Officers Jones, Garcia, Toth, Connolly, and Kalicki testified against him, and according to Glaze, they provided false testimony.  (*Id*. ¶ 41.)  Glaze was acquitted of all charges.  (*Id*.)

## II. Monell Allegations

Glaze alleges that the Chicago Police Department ("CPD") has a policy and practice regarding police shootings of civilians, including inadequate training, supervision, post-incident review, and discipline.  (*Id*. ¶ 43.)  Further, Glaze maintains that these policies and practices directly caused Defendant Officers' unlawful conduct.  (*Id*.)  In support of these allegations, Glaze points to the number of shootings by Chicago police in the past few years.  (*Id*. ¶ 45.)  Specifically, Chicago police shot 61 people in 2009, killing 19; 46 people in 2010, killing 13; 60 people in 2011, killing 23; and 57 people in 2012, killing 8, according to Officer-Involved Shooting Annual Reports, Independent Police Review Authority.  (*Id*.)  In addition, 75% of those shot by CPD officers between 2009 and 2013 have been African-American, with African-American residents over ten times more likely to be shot than white residents.  (*Id*. ¶ 46.)  Also, Glaze contends that Chicago police officers shoot far more residents annually than officers in any other city in the United States and provides statistics in support of this contention.  (*Id*. ¶¶ 47, 48.)

Moreover, Glaze asserts that the unacceptable number of police shootings in Chicago results from the City's inadequate policies and practices, including a lack of any meaningful training or supervision on the use of deadly force against people fleeing from police officers.  (*Id*. ¶ 49.)  In addition, Glaze contends that the Chicago Police Department rarely undertakes a meaningful review when its officers shoot people and almost never disciplines any officers in connection with shootings.  (*Id*. ¶ 50.)  Instead, the Independent Police Review Authority has exonerated CPD officers who shoot Chicago residents in over 99% of cases, regardless of the actual circumstances of the shooting, as did its predecessor, the CPD Office of Professional Standards.  (*Id*.)  Since 2000, the City of Chicago has not found any police shooting by a CPD officer to have been unjustified.  (*Id*.)

## ANALYSIS

In its motion, the City argues that the "prosecution and defense of Plaintiff's multiple and sprawling *Monell* claims — which will involve 'colossal' fact discovery, expert discovery, dispositive motion practice, and perhaps trial — threatens completely to overwhelm what already is a complex Section 1983 action against eighteen individual defendants, to the detriment of the parties, the court, and the judicial process itself." First, despite the City's argument to the contrary, Glaze's *Monell* claim is more precise than the City portrays. In short, Glaze is basing the City's liability on the theory that the City failed to properly train, supervise, review, and discipline its police officers, especially in the use of deadly force against individuals fleeing the police. *See Connick v. Thompson,* \_\_\_ U.S. \_\_\_, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."); *see also Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029-30 (7th Cir. 2006).

Citing to *Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), the City also argues that bifurcation allows the City to avoid burdensome and potentially unnecessary discovery and litigation costs should Plaintiff fail to establish a constitutional violation, and thus, as a matter of law, be unable to prove any *Monell* violation. It appears that the City is arguing that because its liability is contingent on the individual officers' liability, the Court should allow the parties to address the claims against the individual officers first. The Seventh Circuit, however, has rejected the argument that the individual officers' liability is a predicate to finding municipality liability in *Thomas v. Cook County Sheriff's Dep't,* 604 F.3d 293, 305 (7th Cir. 2010) ("a municipality *can* be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict.") (emphasis in original). In this District, many courts relied on *Heller* in granting bifurcation motions under similar circumstances prior to the *Thomas* decision. *See, e.g., Medina v. City of Chicago,* 100 F.Supp.2d 893, 895 (N.D. Ill. 2000). Since the Seventh Circuit decision in *Thomas*, however, courts in this district are reluctant to grant bifurcation motions on this basis alone. *See Awalt v. Marketti,* No. 11 C 6142, 2012 WL 1161500, at *10 n.2 (N.D. Ill. Apr. 9, 2012) (after *Thomas*, "[i]t is clear that the weight of authority holds that bifurcation is now heavily disfavored") (collecting cases); *see also Bell v. City of Chicago*, No. 09 C 4537, 2010 WL 432310, at *2 (N.D. Ill. Feb. 3, 2010).

The City's judicial economy and prejudice arguments fare no better in this case. Under the circumstances, bifurcation would result in two rounds of discovery, two rounds of dispositive briefing, and two trials that would most likely involve the same witnesses and evidence. *See Awalt,* 2012 WL 1161500, at *12. Indeed, piecemeal litigation involving the claims against the eighteen Defendant Officers and the City would delay proceedings in this case, especially because Glaze alleges an extensive cover-up as part of both his *Monell* and constitutional claims against the individual officers. *See Obrycka v. City of Chicago,* 913 F.Supp.2d 598, 600 (N.D. Ill. 2012). Further, the City's prejudice argument that the jury would be confused by the

evidence is best cured by proper jury instructions and evidentiary challenges — not by restricting discovery.

  For these reasons, the Court, in its discretion, denies Defendant's motion to bifurcate.

**Dated:** September 19, 2014

                  _____
                  **AMY J. ST. EVE**
                  **United States District Court Judge**